UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA ex rel.
SAID SAMAAN,

                                    Plaintiff-Relator,

FILED IN CAMERA
AND UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)

      v.

GENERAL DYNAMICS LAND SYSTEMS,
INC., a Foreign Corporation,

Case No
Honorable

**DO NOT RELEASE TO PRESS**
**DO NOT ENTER ON PACER**

                                  Defendant.
_____
David L. Haron (P14655)
Maro Bush (P71930)
Haron Law Group, PLC
Attorneys for Relator
30300 Northwestern Highway
Suite 115
Farmington Hills, MI 48334
Ph. (248) 539-7420
_____

**COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT,**
**31 U.S.C. § 3729 et seq.**
**TRIAL BY JURY REQUESTED**

Relator, Said Samaan, on behalf of the United States, by his attorneys, Haron Law Group, PLC, brings this civil action under the False Claims Act, 31 U.S.C. § 3729 et seq., and on behalf of himself under Major Fraud Against the United States, 18 U.S.C. § 1031, in order to recover

damages from Defendant General Dynamics Land Systems, Inc., a foreign corporation, for their knowing submission of false claims for payment to the United States government, and therefore allege the following:

## JURISDICTION AND VENUE:

1.      Relator Said Samaan, acting on behalf of the United States, brings this action under the *qui tam* provisions of the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733, and on behalf of himself under Major Fraud Against the United States, 18 U.S.C. § 1031.

2.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3730 and 3732(a), 28 U.S.C. § 1345, and 18 U.S.C. § 1031.

3.      Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and under 31 U.S.C. § 3732(a), which provides that "any action under U.S.C. § 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by § 3729 occurred." At all times material hereto, Defendant did business in this District, and the claims set forth in this Complaint arose in this District.

## FILING UNDER SEAL

4.      Under the False Claims Act, this complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on Defendant until the Court so orders. The government may elect to intervene and proceed with the action within sixty (60) days after the government receives the Complaint.

## PARTIES

5.      Realtor Said Samaan (hereinafter "Relator") is an individual and a resident of this District.  He was an employee of Defendant from February 22, 1977 until June 30, 2011.

6. Defendant General Dynamics Land Systems (hereinafter "Defendant GDLS") is a foreign corporation.

## BACKGROUND

### False Claims Act

7. Under 31 U.S.C. § 3729(a)(1), a person may be liable when that person knowingly presents, or causes to be presented, to an officer or employee of the United States government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval.

8. Liability may also be found under 31 U.S.C. § 3729(a)(2) when a person knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government.

9. As defined under 31 U.S.C. § 3729(b), "knowing" and "knowingly" mean that the Defendant: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.

### Major Fraud Against the United States

10. Under 18 U.S.C. § 1031(a), whoever "knowingly executes, or attempt to execute, any scheme or artifice with the intent--(1) to defraud the United State; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises" of a contract of $1,000,000 of greater, shall be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

11. Pursuant to 18 U.S.C. § 1031(b), the fine imposed may be extended to $5,000,000 if the gross loss to the Government is $500,000 or greater, or the offense involves a conscious or reckless rick of serious personal injury.

12. Under 18 U.S.C. § 1031(c), the maximum fine allowed through multiple counts under this section shall not exceed $10,000,000.

13. As prescribed by 18 U.S.C. § 1031(f), a prosecution of an offense under the Major Fraud Against the United States may be commenced any time not later than 7 years after the offense committed, plus any additional time allowed by law.

14. Under 18 U.S.C. § 1031(h), any individual who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated" by an employer "in furtherance of a prosecution under this section (including investigation for, initiation of, testimony for, or assistance in such prosecution)" who was not a participant in the unlawful activity, may obtain all relief necessary to make the individual whole, including "reinstatement with the same seniority status such individual would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees."

## GENERAL ALLEGATIONS – OVERVIEW OF SUIT

15. At all times relevant to the allegations in this Complaint, Relator was employed by Defendant GDLS's headquarters in Sterling Heights, Michigan.

16. Relator was a Senior Engineering Specialist at Defendant GDLS. He was employed from February 22, 1977 until June 30, 2011. Relator performed shock and vibration testing, along with structural and stress analysis for Defendant DGLS.

17. At all times relevant to this Complaint, Defendant GDLS filed false claims against the U.S. Army and was aware that it had done so.

18. Defendant GDLS had a contract with the U.S. Army for the development and testing specifications of a new configuration of a military vehicle, called Stryker Modifications (hereinafter SMOD), which is a modified version of the popular Stryker armored military vehicle.

19. This contract with the U.S. Army called for the production and testing of 296 SMOD vehicles between 2012 and 2013.

20. Defendant GDLS misrepresented vibration testing specification by averaging data that downplayed peak values to the U.S. Army. These fraudulent acts equated 3.9 g-force to .39 g-force, dropping the tested factor by ten. This downplays the peak values of the data, making it invalid.

21. Defendant GDLS's vibration testing specifications run counter to MIL-STD-810G Method 525, the Department of Defense Military Standard for Environmental Engineering Considerations and Laboratory Tests, which outlines the general laboratory testing methods for time waveform replication. One of the purposes of MIL-STD-810G Method 525 is to "provide a degree of confidence that the material can structurally and functionally withstand the measured or analytically specified test time trace(s) to which the material is likely to be exposed in the operational field environment."

22. Defendant GDLS erroneously used MIL-STD-810 Method 514.6, meant for stationary vibration only, and applied it to non-stationary uses for time waveform replication. This resulted in data being dropped down by a factor of ten and could lead to inadequately tested

military vehicles, counter to Method 525, and resulting in the potential harm to members of the U.S. Armed Forces.

23.     MIL-STD-810 Method 525, which outlines non-stationary vibrations for time waveform replication, should have been used instead. Method 525 adequately provides a degree of confidence that a vehicle is structurally sound. Relator suggested that Method 525 should be correctly used instead of Method 514, but he was ignored.

24.     Relator raised his objections to Skip Connon, a senior mechanical engineer who writes government standards such as MIL-STD-810. The expert agreed with Relator that the data being lowered by a factor of ten makes its overall use invalid, but Defendant GDLS continued to ignore Relator's repeated objections.

25.     Defendant GDLS refused to correct false claims against the U.S. Army, despite repeated objections by Relator to the fraud and misrepresentations regarding vibration testing and further, his demand that Defendant GDLS provide refunds to the U.S. Army for the fraudulent testing and misrepresentations regarding the testing was repeatedly ignored. Relator discovered the misrepresentations in 2010, but George Rudish and the management team ignored his objections. In 2011, Relator escalated his objections to the General Counsel and Vice-President of GDLS.

26.     Relator believes Defendant GDLS's misrepresentations could result in serious harm to members of the U.S. Armed Forces through the use of inadequately tested military vehicles which could lead to vehicles that are not structurally sound.

**Defendant GDLS's Government Contract with the U.S. Army**

27.     Defendant GDLS's mission is to provide the "best value across the full spectrum of combat systems to meet the ever-changing needs of our clients and the global defense

market." General Dynamics Land Systems, http://www.gdls.com/about-us/our-mission.php. Defendant GDLS's headquarters are in Macomb County, and the location involves the engineering, design and development, customer service and support, systems integration laboratories, and GDLS staff support functions.

28. Defendant GDLS names strength, speed, and survivability as "the traits inherent in every General Dynamic vehicle and program." General Dynamics Lands Systems, http://www.gdls.com/products.php

29. Defendant GDLS develops vehicles for the U.S. Army, U.S. Marine Corps, and The National Guard. It then supports those products through an international sustainment network that spreads across 14 countries worldwide. General Dynamics Land Systems, http://www.gdls.com/businesses.php

30. Defendant GDLS's organizational hierarchy structure for the Engineering Development department top-to-bottom includes the Sub-Systems Mechanical Engineering Director (hereinafter "SME Director"), the Structure Systems & Analysis Manager (hereinafter "SS&A Manager"), and the Structural Analysis Section Manager (hereinafter "SAS Manager").

31. At all times relevant to this matter, Relator was a Senior Engineering Specialist. This position is on the same level of management as the SAS Manager.

### Defendant GDLS's Stryker Contract with the U.S. Army

32. Upon information and belief, beginning in or about 2004, Defendant GDLS has had a contract (hereinafter the "Stryker Contract") with the U.S. Army regarding the Stryker Program.

33. The Stryker Program involves the creation and development of the major war vehicle called Stryker. The Stryker vehicle is an armored, 8-wheeled vehicle that were used by the U.S. Armed Forces in Afghanistan and Iraq.

34. Pursuant to the Stryker Contract, Defendant GDLS is required to develop and test the war vehicles it designs, manufactures, and sells to the U.S. Army.

35. Since mid-2009, Defendant GDLS has been developing and testing specifications for a new configuration of the "Stryker" combat vehicles, called Stryker Modifications or SMOD. (Ex. 1).

36. Defendant GDLS is required to determine the shock and vibration specifications for the SMOD based on previous baseline Stryker field-testing, and in accordance with baseline military standards.

37. Defendant GDLS is required to determine these specifications in a lab setting and using certain procedures.

38. These specifications are then field-tested again on SMOD, unless it was war-emergency procurement.

39. Only after the Stryker vehicles have undergone extensive lab and field-testing does Defendant GDLS create a Government Test & Analysis Reports (hereinafter "Government T&A Reports") that details the shock and vibration specifications for the SMOD vehicles, the data of which determines if the vehicles are structurally sound.

40. MIL-STD-810 is the Department of Defense Military Standard for Environmental Engineering Considerations and Laboratory Tests, including engineering directives on how to consider various environmental stresses and influences on "material throughout all phases of its service life."

41. Additionally, MIL-STD-810G outlines the general laboratory test method guidelines which include the appropriate test conditions, instrumentation, calibration, and temperatures; MIL-STD-810G further explains data analysis, test monitoring procedures, and standards for correcting interrupted or failed tests.

42. Relator discovered numerous errors in the vibration testing specifications included in the Government T&A Reports.

43. Relator was able to determine, based on his expertise and voluminous experience, that Defendant GDLS was using the wrong vibration testing specification, in violation of MIL-STD-810G. This was causing errors in the Government T&A Reports with regards to vibration testing.

44. Defendant GDLS should have performed vibration testing specifications according to the requirements of MIL-STD-810G for such testing – but it was knowingly failing to doing so.

45. Relator approached the SS&A Manager George Rudish, Relator's supervisor, and objected to the errors in the Government T&A Reports. Relator prepared a report highlighting the misconduct, and showing why it inadequately tested the vehicles by dropping the data by a factor of ten.

46. Relator was particularly concerned that further modifications to the Stryker vehicle would be made based on inaccurate data based on Defendant GDLS conducting the wrong tests. This could lead to injuries to members of the U.S. Armed Forces.

47. Relator's objections were initially ignored by Defendant GDLS's management team.

48. However, Relator continued to raise his objections with higher levels of management within Defendant GDLS during the early part of 2010, including a meeting with a team of engineers

49. Nonetheless, Defendant GDLS continued to use this inaccurate and fraudulent data to make recommendations to the U.S. Army regarding the SMOD vehicles.

### GDLS's False Claims Against the U.S. Army

50. In July 2010, Relator requested a meeting with Defendant GDLS's administrators of the SMOD project – the Chief Engineer, Functional and Program managers, and a working group of engineers.

51. Once again, Relator objected to the use of an improper vibration testing specification which failed to comply with the U.S. Army's standards that resulted in the misrepresentation in peak values measured.

52. Because this testing method took the average of the operation of the SMOD vehicle, it is a misrepresentation as it failed to take into account of the significant importance of the peak values, thereby equating 3.9 g-force to .39 g-force.

53. Defendant GDLS's Chief Engineer assured Relator that he would consult with the SS&A Manager to confirm which testing method was appropriate.

54. In fact, nothing was done to address the improper testing, and Defendant GDLS continued to bill the U.S. Army for false and fraudulent data collected by inappropriate testing methods, despite having been put on notice by Relator that GDLS's testing method was flawed and potentially dangerous to members of the U.S. Armed Forces.

55. In August 2010, Relator contacted Defendant GDLS's SME Director to object to the use of improper tests and the misrepresentations contained in the Government T&A Reports prepared by Defendant GDLS.

56. Once again, Relator's objections were ignored, and Defendant GDLS continued to submit false claims to the U.S. Army

57. In the fall of 2010, Relator filed a formal claim of data misrepresentation, fraud, and retaliation to Defendant GDLS's Human Resources Department.

58. Relator's objections continued to be ignored while Defendant GDLS continued to file false claims against the U.S. Army for inaccurate data pertaining to force on the SMOD vehicles.

59. Defendant GDLS knowingly, as the term is defined in 31 U.S.C. § 3729(b), filed or caused to be filed, with the federal government via the U.S. Army, claims for payment for fraudulent and inaccurate testing which could result in serious harm to members of the U.S. Armed Forces.

60. In March 2011, Relator contacted the President and Vice President of GDLS objecting to the defective, dangerous, and fraudulent misrepresentations contained in the Government T&A Reports prepared by Defendant GDLS.

61. Despite lacking the scientific and technical expertise to evaluate Relator's objections, the President assigned the GDLS General Counsel to investigate Relator's objections of the incorrect testing of military vehicles.

62. Determined to continue on with their fraud and misrepresentation, the General Counsel found no issues with Defendant GDLS's testing standards.

63. Undeterred, in May and June 2011, Relator contacted the US. Army's Aberdeen Test Center and reported his concerns regarding Defendant GDLS's failure to comply, and misrepresentations regarding the SMOD vehicles.

64. Relator specifically contacted the liaison for the Stryker contract, Skip Connon, who is the expert on the testing requirements under the Stryker contract and the U.S. Army's standards such as MIL-STD-810G.

65. The liaison confirmed that GDLS's testing methods and standards were invalid and not according to the contractual military standard, MIL-STD-810G, because important data was being dropped by using GDLS's method.

66. Relator immediately notified the SAS Manager, SME Director, and GDLS General Counsel that the liaison concurred with Relator that GDLS's testing method was invalid and not according to the contractual military standard, MIL-STD-810G.

67. Based on information and belief, in June 2011, the U.S. Army's Tank Automotive Command, located in Warren, Michigan, launched an investigation based on Relator's complaints, but, upon information and belief, the improper testing continued.

### Defendant's Failure to Take Reasonable Steps to Avoid False Claims and Reckless Disregard For or Deliberate Ignorance of False Claims

68. Relator repeatedly and continuously contacted Defendant GDLS management in an attempt to correct the false and fraudulent testing methods and data this method produced, beginning in early 2010 through at least June of 2011.

69. Relator reasonably believed Defendant GDLS knowingly defrauded the United States by misrepresenting the testing and data completed in order to prepare the Government T&A Reports.

70. Relator believes the misrepresentation is potentially dangerous to members of the U.S. Armed forced, as it equates ten units of force to one unit of force.

71. Relator believed it was his duty to correct and prevent these false claims from being filed with the United States, and even more important, to protect the members of the U.S. Armed Forces from substandard vehicles.

72. Relator believed it was his duty, as outlined in Defendant GDLS's Standards of Business Ethics and Conduct, to correct the fraud and misrepresentation in the Government T&A Reports.

## COUNT I
### Violation of 31 U.S.C. § 3729(a)(1)(A)

73. Relator incorporates all allegations set forth above in full.

74. The Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

75. Specifically, the Defendant utilized incorrect and fraudulent testing and data in preparing the Government T&A Reports, resulting in structurally unsound and unsafe SMOD vehicles.

76. At the time of his discharge, the Army's Aberdeen Test Center liaison confirmed that Defendant GDLS was using the wrong testing method.

77. Relator immediately provided this information to management at Defendant GDLS, and they responded by placing him on indefinite suspension.

## COUNT II
### Violation of 31 U.S.C. § 3729(a)(1)(B)

78. Relator incorporates all allegations set forth above in full.

79. The Defendant has knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

80. The United States, unaware of the foregoing circumstances and conduct of Defendant, made full payments which resulted in its being damages in an amount to be determined.

## COUNT III
## Violation of 31 U.S.C. § 3729(a)(1)(C)

81. Relator incorporates all allegations set forth above in full.

82. The Defendant conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(C) subparagraph (A), (B), and (G).

## COUNT IV
## Violation of 31 U.S.C. §3729(a)(1)(G)

83. Relator incorporates all allegations set forth above in full.

84. The Defendant knowingly and/or recklessly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, and knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the government.

85. By virtue of the false, fictitious or fraudulent claims presented or caused to be presented by the Defendant, the United States is entitled to three times the amount by which it was damaged, to be determined, plus a civil penalty for each false claim presented or caused to be presented.

## COUNT V
## Violation of 18 U.S.C. § 1031(a)

86. Relator incorporates all allegations set forth above in full.

87. Defendant committed Major Fraud against the United States when it knowingly executed or attempted to execute a scheme or artifice with the intent to defraud the United States or obtain money by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1031(a).

## COUNT IV
## Violation of 18 U.S.C. § 1031(h)

88. Relator incorporates all allegations set forth above in full

89. Relator was discriminated against as a result of Defendant's fraudulent actions, being placed on indefinite suspension in violation of 18 U.S.C. § 1031(h)(1).

90. Relator was not a participant in the unlawful activity that is the subject of said prosecution, and is entitled to all relief necessary to make him whole pursuant to 18 U.S.C. § 1031(h)(2).

91. Such relief includes reinstatement with the same seniority status such that the individual would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests that this court enter judgment against Defendant as follows:

a. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

    b.       That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States;

    c.       That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relators necessarily incurred in bringing and pressing this case;

    d.       That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

    e.       That Defendant be investigated for violations of Major Fraud Against the United States, 18 U.S.C. § 1031, and Plaintiff be award damages as a result of such an investigation pursuant to 18 U.S.C. § 1031(h);

    f.       That this Court award such other and further relief as it deems proper.

## DEMAND FOR A JURY TRIAL

Relator Said Samaan hereby demands a jury trial on all claims alleged herein.

Respectfully Submitted,
Haron Law Group, PLC

Dated: May 26, 2016

/s/ David L. Haron
HARON LAW GROUP, PLC
David L. Haron (P14655)
Maro Bush (P71930)
Attorneys for Plaintiff-Relator
30300 Northwestern Highway
Suite 115
Farmington Hills, MI  48334
Ph. (248) 539-7420